UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANTIONE MCCULLOUGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00544-SEB-MG |
| | ) | |
| DOWNS Ofc., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND DIRECTING FURTHER PROCEEDINGS**

In August 2022, Correctional Officer Jennifer Downs sprayed Plaintiff Antione[1] McCullough with pepper spray while he was confined in a shower cell at Pendleton Correctional Facility. Officer Shalee Key stood by and did not intervene despite having ample opportunity to do so. No evidence indicates that Mr. McCullough presented a threat to the safety of the officers, other prisoners, or himself.

Later, Officer Alexzander Koenig physically abused Mr. McCullough on the way to his cell. Once there, Officers Koenig and Downs pulled violently against the dog leash attached to Mr. McCullough's handcuffs for several seconds as his hands were trapped against the cell door. Again, no evidence indicates that Mr. McCullough presented a safety threat.

All three defendants have moved for summary judgment. The evidence the parties have designated would require a reasonable trier of fact to return a verdict for Mr. McCullough whether viewed in the light most favorable to him *or* in the light most favorable to the defendants. Therefore, the Court denies the defendants' motion for summary judgment and directs them to

---

[1] The **clerk is directed** to change Mr. McCullough's first name on the docket from "Antone" to "Antione." *See* dkt. 41-1 at 5:21 (deposition transcript).

show cause why the Court should not grant Mr. McCullough summary judgment on the question of liability. Because the motion should not have been filed in the first place, the Court also directs defense counsel to show cause why they should not be sanctioned under Federal Rule of Civil Procedure 11(c).

## I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Indiana Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

"When there are no issues of material fact in dispute, a district judge may grant summary judgment in favor of the non-moving party or may grant summary judgment even though no party has moved for summary judgment." *Jones v. Union Pac. R. Co.*, 302 F.3d 735, 740 (7th Cir. 2002). This "is a 'hazardous' procedure which 'warrants special caution.'" *Id.* (quoting *Peckmann v. Thompson*, 966 F.2d 295, 297 (7th Cir. 1992); *Sawyer v. United States*, 831 F.2d 755, 759 (7th Cir. 1987)). Yet, the Court may grant summary judgment *sua sponte* "as long as the losing party is given notice and an opportunity to come forward with its evidence." *Id.* at 740.

## II. Facts

A party who moves for summary judgment is not obligated to present admissible evidence negating its opponent's claims. *Celotex*, 477 U.S. at 323 ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.") (emphasis in original). Nevertheless, the Court treats the nonmovant's assertions as true to the extent they are supported by admissible evidence, S.D. Ind. L.R. 56-1(f)(2), and the Court does not treat the movant's assertions as true if they are not supported by admissible evidence or if they are contradicted by admissible evidence, S.D. Ind. L.R. 56-1(f)(1).

The defendants designated four pieces of evidence in support of their summary judgment motion: one video of each incident, Mr. McCullough's deposition transcript, and an incident report

ostensibly authored by Defendant Officer Downs and nonparty Captain J. Ernest on the date of the incidents. Dkts. 41-1, 41-2, 50. Mr. McCullough presented the defendants' interrogatory responses, dkt. 46, which are sworn under penalty of perjury. The defendants do not object to their admissibility, *see* dkt. 49, so the Court treats them as admissible evidence for purposes of the summary judgment motion. *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 761 (7th Cir. 2008) ("Pursuant to Rule 56(c), a district court may consider answers to interrogatories when reviewing a motion for summary judgment so long as the content of those interrogatories would be admissible at trial.")

The incident report, dkt. 41-2, consists of a lengthy narrative describing the incidents from Officer Downs' perspective. It is not sworn under penalty of perjury, and it includes numerous statements that are not clearly based on Officer Downs' personal knowledge.[2] For these reasons, the Court cannot treat the incident report like an affidavit or declaration. Fed. R. Civ. P. 56(c)(4). The document was generated outside the current proceeding, so the rule against hearsay prohibits the Court from considering the incident report as evidence of what occurred during the two incidents in question. Fed. R. Evid. 801(c), 802. And the defendants have not offered an affidavit or other evidence to authenticate the incident report. Fed. R. Evid. 901. For these reasons, the incident report is not admissible evidence that the Court can consider to prove the defendants' assertions or disprove Mr. McCullough's assertions.

The following facts are drawn, accordingly, from the video of the two incidents, Mr. McCullough's deposition transcripts, and the defendants' interrogatory responses.

---

[2] *See, e.g.*, dkt. 41-2 at 1 ("Yard Staff mechanically restrained McCullough and escorted him too [*sic*] medical. Completed by Capt. J. Ernest. Once McCullough got to Urgent Care he refused to be medically assessed by medical staff.").

## A.    Pepper Spray Incident

On August 20, 2022, Mr. McCullough was escorted to a shower cell. Defendant Officers Jaime Downs and Shalee Key stood outside the cell while Mr. McCullough showered. Other inmates were showering nearby. Dkt. 41-1 at 10:25–12:20.

Mr. McCullough asked for more soap, believing he did not have enough to wash his body and his long hair. *Id.* at 11:3–19. Officer Downs denied Mr. McCullough's request, and he responded critically, alluding to a recent incident in which an inmate threw feces at Officer Downs, saying, "you wonder why people throw shit on you." *Id.*

Officer Downs told the inmates they had ten minutes to finish their showers, then visited a utility chase and manually turned off the water in Mr. McCullough's shower cell. *Id.* at 11:19–23. Officer Downs returned to Mr. McCullough's shower cell and ordered him to "cuff up"—to present his hands to be placed in handcuffs. *Id.* at 11:23–24.

Mr. McCullough refused to cuff up. *Id.* at 11:24. He explained that he still had soap in his hair and eyes and asked to speak to Sergeant Marados. *Id.* at 11:24–12:3. Officer Downs ordered Mr. McCullough to cuff up a second time and pulled out a can of pepper spray. *Id.* at 12:3–4.

Video of the incident begins with Officer Downs standing in front of Mr. McCullough's shower cell, with a cart separating her from the cell door. Dkt. 50. Mr. McCullough's hand reaches through a slot in the door, takes a towel from the cart, and pulls it back through the slot. *Id.* at 0:03. The slot sits at or slightly above Officer Downs' waist level. Mr. McCullough testified during his deposition that he grabbed the towel to cover his face and protect against pepper spray. Dkt. 41-1 at 10:4–6.

Mr. McCullough's hands extend through the slot for about two seconds. Officer Downs does not have handcuffs in her hands, and she does not reach for them or for Mr. McCullough's

hand. Instead, she pulls a pepper spray cannister from her belt. Dkt. 50 at 0:03. Officer Downs moves the cannister toward the slot in the door and quickly pulls it upward and back toward herself. *Id.* at 0:10. It is impossible to tell whether she dispersed any pepper spray. Officer Key is standing a few feet to Officer Downs' right as this occurs.

After Officer Downs pulls the cannister back toward her body, three officers and an inmate pass behind her and up a nearby staircase. *Id.* at 0:15. They do not stop or noticeably interact with Officer Downs, Officer Key, or Mr. McCullough.

Once the other officers reach the stairs, Officer Downs points her pepper spray cannister inside the door slot and depresses the trigger at least three times. *Id.* at 0:25. Officer Key quickly steps back from the door. *Id.* at 0:26. There is no evidence that she stepped away from the door due to fear that Mr. McCullough would, for example, throw something out the door.

Officer Downs then immediately raises the cannister to head level and depresses the trigger at least twice, spraying into the cell through a wire-mesh panel. *Id.* at 0:27. She then drops the cannister to waist level and joints Officer Key in stepping back from the door. *Id.* at 0:30.

The officers remain perhaps four feet from the door for about one minute. *Id.* The staircase obscures them from view, and it is impossible to see whether they say anything to Mr. McCullough or to one another.

Officer Downs steps back toward the door, immediately aims her cannister through the door slot, and depresses the trigger at least three times. *Id.* at 1:32. She raises the cannister to head level and depresses the trigger at least three more times, spraying through the mesh panel. *Id.* at 1:37. Officers Downs and Key again step back from the door. *Id.*[3]

---

[3] The defendants assert as an undisputed fact that Officer Downs "administered OC spray on Mr. McCullough, to restore order and maintain discipline," citing the video as evidence. Dkt. 42 at 2. They do not acknowledge that Officer Downs administered pepper spray multiple times as the video clearly demonstrates and as Officer Downs acknowledged in the inadmissible incident report. Dkt. 41-2 at 1.

Sometime between the first and second rounds of pepper spray, Officer Downs again told Mr. McCullough to cuff up, and he again refused and requested to speak to the sergeant. Dkt. 41-1 at 12:10–11. He did not comply with the order to cuff up, and he cursed at Officer Downs and made demeaning remarks about her appearance, but he was not threatening. *Id.* at 12:13–14, 27:25–28:9.

About ten seconds after stepping back from the door, Officer Downs appears to operate a radio attached to her shoulder. Dkt. 50 at 1:47. She and Officer Key are largely obscured by the staircase during much of this time. Mr. McCullough expressed anger at being pepper sprayed and again criticized Officer Downs' appearance and maybe said "some homophobic things, but nothing threatening or nothing like that." Dkt. 41-1 at 30:13–19. He believes he "called her a gay pirate or something like that because of her lazy eye." *Id.* at 31:22–24.

About 30 seconds after Officer Downs operates the radio, two officers descend the staircase and stand next to Officers Downs and Key. Dkt. 50 at 2:15. A third officer descends the stairs and has a brief exchange with Officer Downs before leaving the scene. *Id.* at 2:45.

About four minutes after the second round of pepper spray, two new officers arrive on the scene. *Id.* at 5:40. Officers Keys and Downs gesture toward Mr. McCullough's shower cell. *Id.* at 5:43. The new officers approach the cell, and Mr. McCullough extends his hands through the door slot. *Id.* at 5:50. One officer appears to speak with Mr. McCullough through the door for about 25 seconds before handing a towel in through the slot. *Id.* The officer then hands Mr. McCullough's shoes in through the slot, then another towel, and pulls the cart away. *Id.* at 6:45.

The same officer then reaches his hands through the slot and appears to cuff Mr. McCullough's hands. *Id.* at 7:30. He opens the door, and Mr. McCullough exits the cell and

walks off the scene peacefully. *Id.* at 7:45. As Mr. McCullough leaves the camera's view, Officer Downs can be seen smiling. *Id.* at 8:00.

**B.    Leash Incident**

The nondefendant officers took Mr. McCullough from the shower to the infirmary. Dkt. 41-1 at 14:2–5. Mr. McCullough asked to cut the nurse's questioning short because he was experiencing serious pain from the pepper spray—particularly in his genital area—and wished to take a decontamination shower as quickly as possible. *Id.* at 14:5–12.

Defendant Officer Alexzander Koenig was delivering or collecting meal trays in the area near the decontamination shower while Mr. McCullough was in it. *Id.* at 14:13–18. Officer Koenig called Mr. McCullough a "bitch-ass chicken n-----" or a "check-in bitch-ass n-----." *Id.* at 14:18–19; dkt. 46 at 20. Officer Koenig denies making this statement. Dkt. 46 at 20. Mr. McCullough responded, and they went "back and forth verbally." Dkt. 41-1 at 14:20.

Officer Koenig ended Mr. McCullough's decontamination shower prematurely and escorted him back to his cell. *Id.* at 14:21–15:7. Mr. McCullough was not resistant on the walk to the cell, but Officer Koenig tightened Mr. McCullough's handcuffs excessively and pulled his hair while they walked. *Id.* [4]

Video shows Officer Koenig and a nondefendant officer escorting Mr. McCullough from the near end of his range to his cell. Dkt. 50. Mr. McCullough steps into the cell, and the officers stand outside the cell for about 45 seconds before Officer Downs enters the scene. *Id.* at 0:08. Mr. McCullough is not visible, but there is no evidence of a safety or security threat, as Officer Koenig leans casually against the wall. *Id.*

---

[4] The defendants do not acknowledge Defendant Koenig's racial epithet, hair pulling, or handcuff tightening in their statement of facts despite designating Mr. McCullough's deposition as evidence and despite their obvious relevance to the question of whether Officer Koenig acted maliciously. *See* dkt 42 at 3.

When Officer Downs arrives on the scene, the nondefendant officer walks to the far end of the range. *Id.* at 0:58. Officer Keonig pulls multiple times with two hands on the "leash" attached to Mr. McCullough's handcuffs. *Id.*; dkt. 41-1 at 15:14–16. Again, Mr. McCullough is not visible, but there is no indication of any struggle or threat, as Officer Downs stands calmly with her hands at her waist. Dkt. 50 at 0:58.[5]

When the nondefendant officer reaches the far end of the range, the cell door begins to close. *Id.* at 1:30. Mr. McCullough was standing in his cell with his hands cuffed behind his back and his shower paraphernalia in his hands. Dkt. 41-1 at 38:3–14. He turned his back to the cell door so the officers could undo his handcuffs as quickly as possible. *Id.* at 38:25–39:4. At this point, Mr. McCullough's wrists were bleeding because Officer Koenig tightened the cuffs so tightly. *Id.*

Ordinarily, an officer would reach through the cell's cuff port, release one handcuff, pull the inmate's other hand through, and then release the second handcuff. *Id.* at 37:20–38:2. This procedure is necessary because an inmate with his hands cuffed behind his back cannot lift them and maneuver them through the cuff port. *Id.* at 39:24–40:1. This procedure mirrors that used by the nondefendant officer who reached through the slot to cuff Mr. McCullough's hands in the shower cell. *See* dkt. 50, video 1, at 7:30.

Instead, Officers Downs and Koenig both grab the leash with both hands and pull backward forcefully, as in a tug of war. Dkt. 50 at 1:45. Officer Downs places her foot against the cell door for leverage. *Id.* This continues for about 12 seconds before Officer Downs pulls an object through the cuff port and tosses it aside. *Id.* at 1:57.

---

[5] The defendants also do not acknowledge Defendant Koenig pulling on the leash in their statement of facts despite designating the video and despite its relevance to malice or wantonness. *See* dkt. 42 at 3.

That object was a shower shoe, which Mr. McCullough had been holding and which became trapped against the cell door when the officers yanked on the leash. Dkt. 141-1 at 38:12–20. There is no evidence that the officers were unable to see that Mr. McCullough was holding his shower paraphernalia or that they ordered him to drop it before they pulled on the leash.

After Officer Downs tossed the shower shoe aside, she and Officer Koenig continue to pull with both hands on the leash or Mr. McCullough's hands for about ten seconds. Dkt. 50 at 1:57. Officer Koenig places his foot on the door at perhaps the height of the cuff port for additional leverage. *Id.* This continues until the nondefendant officer approaches, at which point Officer Downs undoes one handcuff, pulls Mr. McCullough's second hand through the port, and then undoes the second cuff. *Id.* at 2:07; dkt. 41-1 at 39:9–40:14.

The defendants state in their statement of facts that the officers were able to remove his handcuffs once the shower shoe was taken. Dkt. 42 at 3. However, the video shows that they continued pulling on Mr. McCullough for ten seconds after Officer Downs tossed the shoe aside, and she does not appear to have reached through the cuff port for another ten seconds after that. *See* dkt. 50 at 1:57.

While the officers pulled on Mr. McCullough, he was "cussing and insulting them," but he did not threaten them. Dkt. 41-1 at 40:15–24. Mr. McCullough's wrist was bleeding after the incident. *Id.* at 40:25–41:7. Officer Koenig said, "Fuck you," and the officers walked off the range. *Id.* at 16:12–14.

### III. Analysis

When the Court screened Mr. McCullough's amended complaint, it identified plausible Eighth Amendment claims based on Officer Downs' and Koenig's uses of force and Officer Key's failure to intervene.

The Eighth Amendment protects inmates from cruel and unusual punishment, including excessive force by prison officials. *McCottrell v. White*, 933 F.3d 651, 662 (7th Cir. 2019). The Eighth Amendment allows officers to use force "in a good-faith effort to maintain or restore discipline." *Id.* at 664 (cleaned up). But malicious or sadistic force—even if it does not cause a serious injury—is prohibited. *Id.* To distinguish between good-faith and malicious force, courts consider several factors, including:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

*Id.* at 663; *see also Whitley v. Albers*, 475 U.S. 312, 321 (1986). Additionally, to survive summary judgment, a plaintiff must present evidence supporting "a reliable inference of wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322.

"An officer who fails to intervene to try to prevent known cruel or unusual force, despite a reasonable opportunity to do so, may be held liable under [42 U.S.C.] § 1983." *Wilborn v. Ealey*, 881 F.3d 998, 1007 (7th Cir. 2018).  More specifically:

> An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis in original). "A 'realistic opportunity' means a chance to warn the officer using excessive force to stop." *Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014) (cleaned up). "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact

unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise."
*Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (cleaned up) (emphasis in original).

## A.    Officer Downs—Pepper Spray Incident

Viewed in the light most favorable to Mr. McCullough, a trier of fact could reasonably find that Officer Downs sprayed Mr. McCullough wantonly and maliciously and therefore violated the Eighth Amendment. In fact, the record before the Court would require a trier of fact to find an Eighth Amendment violation even viewing the evidence in the light most favorable to Officer Downs. Both are true even considering the affirmative defense of qualified immunity, which is not available here factually or legally.

### 1.    Facts Most Favorable to Mr. McCullough

Viewed in the light most favorable to Mr. McCullough, the record tells the following story. Mr. McCullough made a critical and profane comment toward Officer Downs, and she responded by turning the water off in Mr. McCullough's shower cell prematurely. She ordered him to cuff up, and he refused and requested to speak to a sergeant. He did not threaten violence and in any event could not have harmed Officer Downs or anyone else from inside the shower cell. Moreover, Officer Downs did not demonstrate any real interest in placing Mr. McCullough in handcuffs, as she never removed them from her belt and did not grab at Mr. McCullough's hand when he reached through the door slot. Instead, Officer Downs administered pepper spray at least twice and possibly three times. More precisely, in the space of 100 seconds, she administered at least 11 bursts of pepper spray. Officer Downs administered so much pepper spray that she and Officer Key had to step away from the shower cell. When another officer approached the cell, Mr. McCullough submitted to handcuffs and left without incident. And, as he did, Officer Downs smiled.

A trier of fact could reasonably find that there was no need for Officer Downs to apply force at all, or, alternatively, that any need was minimal and created by Officer Downs. *McCottrell*, 933 F.3d at 663. Three officers passed the shower cell in the 15 seconds between the time Officer Downs took her pepper spray from her belt and pointed it at the cell and the time she issued her first multi-burst round of pepper spray. Dkt. 50 at 0:10. Officer Downs did not visibly seek any assistance, and the officers did not stop or otherwise acknowledge any disturbance. Accordingly, there is no basis for inferring that the situation required serious force to restore order.

It is undisputed that Mr. McCullough refused multiple orders to cuff up, but it is also beyond dispute that he never presented a threat to anyone's safety. The defendants have not designated any evidence that he could harm anyone from inside the locked shower cell. To the extent there was any disorder at all, it did not exist until Officer Downs shut off the water to Mr. McCullough's shower cell, which itself can be viewed as a malicious reaction to a disrespectful but ultimately harmless comment.

A trier of fact also could reasonably find that the force Officer Downs used was excessive in relation to any need for force. There is no evidence that Mr. McCullough posed a safety threat when Officer Downs pulled her pepper spray from her belt—much less that he continued to pose a threat when she issued a second, multi-burst round of pepper spray. The fact that Officers Downs and Key stepped back from the cell indicates that the amount of spray she used was potent. It is not clear what Officer Downs aimed to achieve by spraying Mr. McCullough, as she never actually attempted to restrain him. But no evidence indicates that the amount of pepper spray she used was realistically necessary to achieve any legitimate objective.

The extent of Mr. McCullough's injury was perhaps minor compared to what might result from other uses of force, *see McCottrell*, 933 F.3d at 663, but it is undisputed that he experienced

burning due to the spray, including in his genital area. And the significance of an injury is not dispositive; it is relevant as a tool for measuring "the amount of force applied" and "whether the use of force was plausibly necessary." *Id.* at 664. The amount of force in this case is not in question, as video captured the use of force and shows that it was excessive in relation to any need for force.

As noted above, there was no perceptible threat to staff or inmate safety. *McCottrell*, 933 F.3d at 663. Mr. McCullough was at worst disrespectful. No threat is evident from the video, and the defendants declined to present affidavits or other evidence attesting to a threat.

Finally, there is no evidence that Officer Downs attempted to temper the severity of a forceful response. *McCottrell*, 933 F.3d at 663. If Officer Downs' objective was to place Mr. McCullough in handcuffs, it is not clear why she did not attempt to do so when Mr. McCullough reached his hand through the slot to grab a towel. But she never grabbed at Mr. McCullough's hands or removed her handcuffs from her belt. Further, no evidence allows an inference that Officer Downs made a good-faith effort to limit her use of pepper spray. She *began* by issuing at least five bursts of pepper spray and then issued at least six more. These indisputable facts are wholly inconsistent with the notion that Officer Downs attempted to temper the severity of her force.

In short, on the record provided, all five factors weigh in favor of finding that Officer Downs' use of pepper spray was malicious. There is, additionally, ample evidence to support "a reliable inference of wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322. The only possible justification for Officer Downs' use of force is that Mr. McCullough refused an order, and the record supports an inference that she issued that order only to retaliate for Mr. McCullough's harsh remark. She had an opportunity to force compliance with that order without using pepper spray, but she did not take it. Her use of pepper spray was heavy handed, and, when the incident was over, she was caught grinning like the cat who ate the canary. A

14

reasonable trier of fact could determine from this evidence that Officer Downs turned off Mr. McCullough's water and ordered him to cuff up to spark a conflict that would justify her use of pepper spray and that she then used it wantonly.

The defendants argue that summary judgment is appropriate because Officer Downs' use of force "was brief and used in an attempt to control the situation when Plaintiff was failing to comply to direct orders." Dkt. 42 at 6. But the record would not require a trier of fact to find that there was a situation to control. No other officers acknowledged any disruption, and there is no evidence that Mr. McCullough presented any threat. Further, Officer Downs' use of force was not brief, as she administered at least eleven bursts of pepper spray.

The defendants also argue that summary judgment is appropriate because Officer Downs was "attempting to restore order as Mr. McCullough was admittedly actively making homophobic comments to Defendant Downs and insulting her appearance while refusing to comply with orders." Dkt. 42 at 6. As a legal matter, the relevant question is not simply whether Officer Downs was attempting to restore order, but rather whether she was making a *good-faith* attempt to restore order. *McCottrell*, 933 F.3d at 662. And, as a factual matter, there is ample evidence that Officer Downs was not acting in good faith. Despite her order to cuff up, she did not try to restrain Mr. McCullough and remove him from the cell, even when he reached his hand out. Moreover, a trier of fact could find that she incited Mr. McCullough's disobedience by maliciously turning off the water in Mr. McCullough's shower cell. The Constitution does not allow an officer to provoke an inmate and then cite "his reaction as" an "excuse to attack him." *Mitchell v. Kruger*, 594 F. App'x 874, 877 (7th Cir. 2014) (citing *Hendrickson v. Cooper*, 589 F.3d 887, 889–91, 894–95 (7th Cir. 2009)).

Additionally, Mr. McCullough made insulting and homophobic comments *after* Officer Downs sprayed him. This is clear both from Mr. McCullough's testimony *and* from Officer Downs' account in the inadmissible incident report. Dkt. 41-1 at 30:13–19, 31:22–24; dkt. 41-2 at 1 ("I then gave offender McCullough a one second application of OC. I then gave McCullough another direct order to comply to mechanical restraints. McCullough then refused to comply and continued yelling profanities at us. I then gave McCullough a one second application of OC towards target and missed."). Indeed, the defendants acknowledge as much in their reply brief but nevertheless suggest that Mr. McCullough's utterance of crude comments and insults *after* being sprayed voids any protection the Eighth Amendment might have offered him. Dkt. 49 at 2.

Mr. McCullough's remarks were heinous and may have justified discipline through the prison's administrative process. But the record leaves no doubt that they were *reactions* to Officer Downs' use of force, not *threats* requiring the use of force. *See Hendrickson*, 589 F.3d at 891 ("Hendrickson . . . made no threatening movements towards Cooper, or anyone else, but simply responded to Cooper's repeated cussings with an insult of his own. Accepting Hendrickson's version of events, as we must, Cooper did not reasonably perceive any threat from Hendrickson and had no need to use any force.").

### 2. Facts Most Favorable to Defendants

The outcome does not change if the Court views the record in the light most favorable to the defendants. The record consists of the video, which speaks for itself, and Mr. McCullough's deposition testimony. This case does present the trier of fact with two competing accounts. The baseline facts are not subject to dispute: Mr. McCullough criticized Officer Downs; she responded by telling him to cuff up; he refused; and she sprayed him with at least eleven bursts of pepper spray despite the absence of any physical threat.

The Court has considered that a different trier of fact might weigh the facts in a manner more favorable to Officer Downs. But any application of the undisputed facts to the five factors ends with the conclusion that Officer Downs used more force than necessary to maintain or restore order. Perhaps Officer Downs did not act with malice when she turned off Mr. McCullough's water, and perhaps she initially determined that she needed to use pepper spray to assert discipline over Mr. McCullough and remove him from the cell. If so, the video still shows that Officer Downs never tried to handcuff Mr. McCullough, even when he stuck his hands through the slot. The video and Mr. McCullough's deposition testimony establish that he never posed any physical threat to Officer Downs, Officer Key, or anyone else at the prison. And yet Officer Downs applied pepper spray *twice*, each time in a volume that required her and Officer Key to step away. If a trier of fact could find that Officer Downs' *first* use of pepper spray was justifiable, no evidence could support a finding that her discharge of an additional six bursts of pepper spray was anything but wanton and malicious.[6]

### 3. Qualified Immunity

The defendants argue that Officer Downs is entitled to the protection of qualified immunity. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (citation omitted) (internal quotation marks omitted). "[T]wo central questions must be addressed in the course of determining whether qualified immunity is available:

---

[6] This analysis would not change if Officer Downs' incident report was admissible. That document does not offer any evidence that Mr. McCullough ever presented a threat to anyone's safety or any evidence that would otherwise justify two applications of pepper spray. Dkt. 41-2 at 1. The report does state that Officer Downs issued two "one second" applications of pepper spray, but this does not create a material factual dispute. Even if Officer Downs testified under oath that she issued two one-second bursts of pepper spray, that testimony would be "so utterly discredited by" the video "that no reasonable jury could" believe her, so the Court must view "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

whether the plaintiff has alleged a deprivation of a constitutional right at all, and whether the right at issue was clearly established at the time and under the circumstances presented." *Bianchi v. McQueen*, 818 F.3d 09, 319 (7th Cir. 2016) (citation omitted). To make a qualified immunity determination, the Court must "(1) determine whether the plaintiff has alleged the deprivation of an actual constitutional right and (2) if so, determine whether that right was clearly established at the time of the alleged violation." *Sparing v. Village of Olympia Fields,* 266 F.3d 685, 688 (7th Cir. 2001) (*citing Saucier v. Katz*, 533 U.S. 194 (2001) (citations omitted)). Once raised, the plaintiff, not the defendant, carries the burden of overcoming the affirmative defense. *Sparing*, 266 F.3d at 688 (*citing Spiegel v. Cortese*, 196 F. 3d 717 (7th Cir. 1999).

The defendants do not dispute that Mr. McCullough had a clearly established right to be free from the wanton and malicious use of pepper spray. Rather, they argue:

> Plaintiff admits to failing to comply to direct orders from Defendant Downs and Defendant Key. [. . .] He further admits to making homophobic statements and insulting Defendant Downs. [. . .] Here, Defendant Downs administered OC spray on Plaintiff to maintain discipline and restore order. [. . .] Any reasonable person would find the actions by Defendant Downs [. . .] would be reasonably lawful.

Dkt. 42 at 10 (citations and discussion of Officer Key omitted). They add: "It is not clearly unlawful for a correctional officer to deploy OC spray to an offender who is actively failing to comply to orders and yelling insults in a disorderly manner." *Id.* These arguments fail both factually and legally.

"When material facts are disputed, a jury must resolve those disputes," even when the facts are material to qualified immunity. *Bayon v. Berkebile*, 29 F.4th 850, 854 (7th Cir. 2022). Here, the material facts are not in dispute, and they point to the conclusion that Officer Downs used pepper spray in circumstances and in a magnitude where it was not warranted.

Further, the defendants acknowledge in their brief that the use of pepper spray violates the Eighth Amendment "'if it is used in quantities greater than necessary or for the sole purpose of

punishment or the infliction of pain.'" Dkt. 42 at 6 (quoting *Musgrove v. Detella*, 74 F. App'x 641, 646 (7th Cir. 2003)); *see also Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) (same). The record the parties have assembled requires a finding that Officer Downs used pepper spray either for the sole purpose of punishing or inflicting pain on Mr. McCullough or in greater quantities than were necessary to achieve a legitimate purpose. While it may not *always* be clearly unlawful for an officer to use pepper spray against an inmate who refuses orders and yells insults, it is clearly unlawful to use pepper spray in the volume Officer Downs dispensed against an inmate who does not pose any physical threat and whose disobedience was provoked by the officer. *See* dkt. 42 at 6; *Mitchell*, 594 F. App'x at 877; *Hendrickson*, 589 F.3d at 891. Accordingly, Officer Downs cannot benefit from qualified immunity at this stage.

## B.    Officer Key—Pepper Spray Incident

The defendants argue that Officer Key is entitled to summary judgment for the sole reason that Officer Downs' use of pepper spray was constitutional, so there was no violation for Officer Key to prevent. The entirety of their argument is:

> Mr. McCullough cannot show that Defendant Downs violated his constitutional rights when he failed to comply with orders and act out with disorderly conduct as he made homophobic comments and insults. Therefore, there is no constitutional right that is being violated, and there is no basis for a claim of failure to intervene against Defendant Key.

Dkt. 42 at 9.

The defendants' argument fails for the reasons set out in Part III(A) above. On the record the parties have presented, a trier of fact would have no choice but to find that Officer Downs violated the Constitution by pepper spraying Mr. McCullough wantonly and maliciously. The defendants do not argue that Officer Key intervened to stop Officer Downs' excessive use of force, and there is no evidence to support a finding that they did.

As a result, Officer Key's liability turns on the question of whether she had a reasonable opportunity to intervene. Again, even viewing the evidence in the light most favorable to Officer Key, a reasonable trier of fact would have no choice but to find that she had a realistic opportunity to warn Officer Downs to terminate her use of pepper spray but declined to do so. *Miller*, 761 F.3d at 826. Officer Key stood by as Officer Downs administered at least five bursts of pepper spray into the shower cell. Officer Key stepped back from the cell and stood next to Officer Downs for a minute—more than enough time to warn her against further use of the pepper spray.

But Officer Key did not intervene during that minute.

Or when Officer Downs approached the cell again.

Or when she brandished the cannister.

Or when she depressed the trigger at least three times.

Or when she raised the cannister to the mesh panel.

Or when she depressed the trigger at least three more times

A "reasonable jury could not possibly conclude" that Officer Downs lacked a reasonable opportunity to intervene. *Abdullahi*, 423 F.3d at 774.

Like Officer Downs, Officer Key is not protected by qualified immunity at this stage. The defendants argue: "As the OC spray was administered, Defendant Key was aware of the Plaintiff's failure to comply with orders and the statements he was making towards Defendant Downs. Any reasonable person would find the actions by Defendant Downs and Defendant Keys would be reasonably lawful." Dkt. 42 at 10. For the reasons set out in the previous section, this argument too fails factually and legally. There is no dispute that Mr. McCullough refused to comply with an order. But, even viewing the evidence in the light most favorable to the defendants, there is no

evidence that he posed a threat that required multiple uses of pepper spray. This violated Mr. McCullough's clearly established right to be free from the use of pepper spray "in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain," dkt. 42 at 6, and Defendant Key abandoned her clearly established obligation to intervene against that excessive use of force.

## C.    Officer Koenig & Officer Downs—Leash Incident

Viewed in the light most favorable to Mr. McCullough, a trier of fact could reasonably find that Officers Koenig and Downs used malicious, wanton force against Mr. McCullough when they pulled his hands through the cuff port using the dog leash. In fact, the record before the Court would require a trier of fact to find an Eighth Amendment violation even viewing the evidence in the light most favorable to the defendants. Again, both are true even considering the affirmative defense of qualified immunity, which does not apply here factually or legally.

### 1.  Facts Most Favorable to Mr. McCullough

Viewed in the light most favorable to Mr. McCullough, the record tells the following story. Officer Koenig called Mr. McCullough a "bitch-ass chicken n-----" or a "check-in bitch-ass n-----" during his decontamination shower. Dkt. 41-1 at 14:18–19; dkt. 46 at 20. When Mr. McCullough responded, Officer Koenig ended Mr. McCullough's decontamination shower prematurely, then tightened Mr. McCullough's handcuffs excessively, causing his wrists to bleed, and pulled his hair while they walked back to Mr. McCullough's cell. Mr. McCullough never resisted or posed a threat during the walk to his cell or after they arrived there. Nevertheless, Officer Koenig pulled the leash multiple times with two hands while waiting for the cell door to close. Once the door closed, Mr. McCullough turned around so Officers Koenig and Downs could reach through the cuff port and remove his restraints. Instead, both officers grabbed the leash with

both hands and pulled backward, placing their feet on the cell door for leverage, and continuing for about ten seconds after clearing a shower shoe that was caught in the cuff port. They released the leash and made an earnest effort to remove Mr. McCullough's handcuffs only after a third, non-defendant officer neared them.

The record before the Court would support a reasonable jury in finding that there was no need to apply force and that there was no threat to inmate or staff safety when the officers pulled on the leash. *McCottrell*, 933 F.3d at 662. The video does not show any resistance or threat whatsoever, and Mr. McCullough's testimony that he turned and presented his hands to the officers is undisputed. Nothing in the record offers any reason why Mr. McCullough would benefit from keeping his cuffs on, and he in fact testified that he wished to have them removed a quickly as possible. And the video shows Officer Koenig leaning casually against Mr. McCullough's cell and Officer Downs standing calmly with her hands at her waist in the moments before the incident. No evidence supports an inference that these officers perceived any threat to anyone's safety.

There being no need to pull on the leash in the first place, a trier of fact would reasonably find that the force the officers used here was excessive. *See McCottrell*, 933 F.3d at 662. There is no evidence from which a reasonable trier of fact could determine that the officers attempted to limit the extent of their force. *See id.* Indeed, the officers appear to have maximized their force by placing their feet on the cell door for leverage and continuing to pull on the leash after the object obstructing Mr. McCullough's hands was clear. Finally, even if Mr. McCullough's injuries were minor, the severity of his injury is only a tool for measuring "the amount of force applied" and "whether the use of force was plausibly necessary." *Id.* at 664. The video and Mr. McCullough's undisputed testimony offer ample bases for a reasonable trier of fact to determine that no force was necessary and the force used was great.

The defendants argue that summary judgment is warranted because "Mr. McCullough was actively blocking the cuffport with his shower shoe." Dkt. 42 at 7–8. The defendants cite no evidence in support of that statement, and the Court finds none. Mr. McCullough testified that officers ordinarily remove handcuffs by reaching into the cuff port, releasing one hand, then pulling the other through and releasing it. Dkt. 41-1 at 37:20–38:2. The video shows that the officers did not reach inside the cuff port before they began pulling on Mr. McCullough's leash. There also is no evidence the defendants told Mr. McCullough to drop the shoe before trying to pull his hands through the cuff port. Instead, the video at minimum supports an inference that the defendants pulled on the leash without warning and that any resistance was involuntary.

The defendants also argue that the use of force was reasonable because Mr. McCullough should have just "dropped his hands and put his hands through the cuffport." Dkt. 42 at 7–8. But Mr. McCullough testified that an inmate who has his hands cuffed behind his back cannot lift his hands and place them through the cuff port, dkt. 41-1 at 39:24–40:1, and the defendants do not cite contrary evidence.

The defendants assert that Mr. McCullough "instigated" the officers' use of force by cursing and insulting them. Dkt. 42 at 8. They misrepresent his testimony. Mr. McCullough testified to "cussing and insulting" the officers as they were removing his handcuffs, not before they began the pulling on the leash. *See* dkt. 41-1 at 40:6–24. The Constitution does not allow officers to physically abuse inmates, then avoid liability because the inmates respond to their violence with harsh words. *Mitchell*, 594 F. App'x at 877; *Hendrickson*, 589 F.3d at 891.

Finally, the record is filled with additional evidence that the defendants yanked on the leash maliciously and wantonly. Only a short time before, Officer Downs sprayed Mr. McCullough gratuitously with pepper spray, then grinned as he was escorted from the scene. Officer Koenig

23

degraded Mr. McCullough with a racial epithet, then terminated his decontamination shower early. Officer Koenig tightened Mr. McCullough's handcuffs so tight that his wrists bled, then pulled his hair while leading him to his cell. And he began yanking on Mr. McCullough's leash before the cell door even closed. With the exception of Officer Downs' use of pepper spray, the defendants do not acknowledge these facts, much less attempt to justify the officers' actions.

For these reasons, a reasonable trier of fact could return a verdict against Officers Koenig and Downs.

### 2. Facts Most Favorable to Defendants

The outcome does not change if the Court views the record in the light most favorable to the defendants. The record contains only one factual dispute: Mr. McCullough maintains that Officer Koenig called him a racial slur during his contamination shower, and Officer Koenig denies the allegation. *Id.* at 14:18–19; dkt. 46 at 20. Otherwise, the video speaks for itself, and Mr. McCullough's testimony is undisputed. As the Court discussed at length in the previous section, that record offers plenty of evidence that Mr. McCullough posed no threat and the defendants acted maliciously and wantonly.

The Court has considered that a different trier of fact might apply the facts in a manner more favorable to Officers Koenig and Downs, but any application of the undisputed facts to the five factors leads to a finding that their force was unwarranted. Mr. McCullough presented no threat. How could he? He was in a locked cell with his hands cuffed behind his back. Mr. McCullough turned his back so the defendants could reach in and undo his cuffs according to the normal protocol. They did not apply that protocol and instead tried to jerk his hands viciously through the cuff port. No construction of the evidence leads to the conclusion that any force was necessary, and the video leaves no doubt that the force used was substantial.

Perhaps the defendants are correct that Mr. McCullough could have abbreviated their use of force by dropping his shoe once his hands became caught on the cell door, but this argument is at best a red herring. Had the defendants reached in through the cuff port to undo Mr. McCullough's first handcuff, as the undisputed evidence tells is common, the shoe would have posed no obstruction. The shoe became relevant only after the defendants jerked backward on the leash, an action that was not justified by any safety threat. Further, the record offers no reason to infer that the defendants could not see the shoe in Mr. McCullough's hand before they began pulling on the leash, much less that they ordered him to drop it before they began their effort to pull his hands through the cuff port. And, most problematically, the officers continued to pull on the leash or Mr. McCullough's hands for about ten seconds *after* Officer Downs cleared the shoe. At best, Mr. McCullough's failure or refusal to drop the shoe justifies some of the defendants' use of force; it does not excuse all of it.

The statements in the unworn, unsigned, unauthenticated incident report would create a material factual dispute if they were admissible. According to the report, Mr. McCullough "tried jerking the restraints into his cell." Dkt. 41-2 at 1. This statement is dubious, as the Court can conceive of no reason why Mr. McCullough would want to remain in handcuffs, and it is directly contradicted by Mr. McCullough's testimony, so it could not secure summary judgment for the defendants. If the statement was admissible, it could create a factual dispute about the basis for the defendants' use of force that could avoid summary judgment in Mr. McCullough's favor.

On the record the parties have assembled, however, only one conclusion is possible. The defendants pulled violently on Mr. McCullough's leash for several seconds despite the fact that he posed no threat. A reasonable trier of fact would have no choice but to return a verdict for Mr. McCullough against Officers Koenig and Downs.

25

### C.  Qualified Immunity

The defendants seek qualified immunity on the basis that:

> Plaintiff admits that he was holding his shower shoe in a manner essentially blocking his wrists and not allowing Defendants to take off his handcuffs once he returned to his cell. [. . .] The video then clearly shows Mr. McCullough does not have his hands out of the cuff port on his own until his shoe was taken out of the cell.

Dkt. 42 at 10 (internal citation omitted). They add that it is "not unlawful to apply pressure to the arms of an offender who is actively not allowing Defendants to remove his handcuffs once he is back in his cell." *Id.* at 10–11.

But the undisputed factual record supports a finding that the defendants did not need to pull on Mr. McCullough's dog leash to undo his handcuffs. Rather, he could not maneuver his hands out of the cell on his own, and they needed to reach through the cuff port to undo them. They began pulling on the leash unnecessarily and at a time when he posed no safety threat. Further, they began pulling without ordering Mr. McCullough to drop the shoe that would ultimately obstruct his hands, and they continued pulling violently after the shoe was clear. The defendants may ultimately be entitled to qualified immunity, but they rely on a set of facts that is not supported by the current record. *Bayon*, 29 F.4th at 854.

### D.    Conclusion

The defendants sought summary judgment on every claim against every defendant. However, the evidentiary record the parties have assembled would allow a reasonable jury to resolve every claim in Mr. McCullough's favor. Indeed, there is only one evidentiary dispute, and when it is resolved in the *defendants*' favor, the record leaves no question that the defendants violated the Eighth Amendment.

If the defendants can present no additional evidence showing that Mr. McCullough presented a safety threat or otherwise justifying the uses of force so clearly captured on film, there

is no need for a trial to determine that the defendants are liable to Mr. McCullough. Accordingly, the Court will invoke Rule 56(f)(1) and direct the defendants to show cause why Mr. McCullough should not receive summary judgment on the question of liability, with the question of damages to be resolved at a trial.

### IV. Rule 11 Sanctions

The Court has found that the undisputed evidentiary record not only allows but *requires* that every claim be resolved in Mr. McCullough's favor. This means that the defendants' summary judgment motion must be denied and that they must be presented an opportunity to show cause why the Court should not resolve the question of liability in Mr. McCullough's favor. It also means the defendants should not have moved for summary judgment in the first place.

Federal Rule of Civil Procedure 11(b) warns attorneys that, every time they file papers with the Court, they make certain representations. These include that their claims, defenses, and legal contentions are warranted by existing law or a nonfrivolous argument for modifying existing law; that their factual contentions have evidentiary support; and that their factual denials are warranted on the evidence. Fed. R. Civ. P. 11(b)(2)–(4). Attorneys certify both that their submissions meet these standards *and* that they have undertaken "an inquiry reasonable under the circumstances" to verify they can make these certifications in good faith. *Id.*

"[T]he court may impose an appropriate sanction on any attorney, law firm, or party that violated" Rule 11(b) "or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." Fed. R. Civ. P. 11(c)(1). "A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). "The sanction may include nonmonetary directives; an order to pay a

penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." *Id.* "The district court has wide latitude to determine what sanctions should be imposed for a Rule 11 violation, and may impose non-monetary sanctions when appropriate to deter repetition of the offending conduct." *U.S. Bank Nat. Ass'n, N.D. v. Sullivan-Moore*, 406 F.3d 465, 471 (7th Cir. 2005).

"Rule 11 establishes an objective test, and . . . an 'empty head but a pure heart is no defense.'" *U.S. Bank Nat. Ass'n, N.D. v. Sullivan-Moore*, 406 F.3d 465, 470 (7th Cir. 2005) (quoting *Chambers v. Am. Trans Air, Inc.*, 17 F.3d 998, 1006 (7th Cir.1994)). Heavy caseloads do not excuse sanctionable conduct. *Id.* ("Neither the firm's caseload nor its practice of shuffling cases from one attorney to another within the firm excuses the type of negligent action that caused Sullivan–Moore to be evicted.").

The defendants moved for summary judgment on Mr. McCullough's Eighth Amendment claims. They acknowledge in their brief that Mr. McCullough's claims turned in part on the need for force to be used and whether the defendants reasonably perceived a threat. Dkt. 42 at 4–5. And yet, as evidence, they designated only the video, Mr. McCullough's deposition testimony, and an inadmissible incident report. The video shows no resistance or threatening behavior by Mr. McCullough. His deposition testimony denies any resistance, save for disobeying an order intended to harass him, and denies any threatening conduct at all. The incident report also includes no evidence of a safety threat and, at best, creates a dispute with some of Mr. McCullough's deposition testimony.

It is fundamental that a summary judgment motion can only be granted if there are no material factual disputes and a reasonable trier of fact could not return a verdict for the nonmovant

under any construction of the evidence. *See* Fed. R. Civ. P. 56(a). For the reasons set out in Part III, defense counsel should have recognized, after reviewing the law cited in their brief and the evidence attached to it, that summary judgment was not possible in this case.

The defendants' brief repeatedly either fails to acknowledge critical facts or asks the Court to resolve factual disputes in their favor. For example, the defendants never acknowledge in their brief or their reply that Officer Downs applied pepper spray more than once. *See* dkt. 42 at 2, 6. The defendants assert in their brief that video "confirms" that Officer Downs used force "in an attempt to control the situation," *id.* at 6, but this cannot be confirmed by the video, as it does not show Mr. McCullough until he is escorted away. They further assert that "Downs was further attempting to restore order as Mr. McCullough was admittedly actively making homophobic comments to Defendant Downs and insulting her appearance," *id.*, despite Mr. McCullough's testimony that he did not make those comments until *after* Officer Downs began using the pepper spray. Dkt. 41-1 at 30:13–19, 31:22–24. Indeed, the incident report verifies that sequence of events. Dkt. 41-2 at 1. The defendants describe Mr. McCullough as "actively blocking the cuffport" despite his deposition testimony that he did not resist the officers' attempt to handcuff him. Dkt. 42 at 7–8. They describe Mr. McCullough as instigating the officers' use of force at his cell, ignoring his testimony that he was fully compliant, his testimony that Officer Koenig verbally and physically abused him before they ever reached the cell, and the video showing Officer Koenig pulling on the leash before the cell door ever closed. Dkt. 42 at 8.

The defendants appear to have based their litigation strategy on the hope that the Court would not take the time to check the record. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014). At best, even a cursory review of the materials the defendants themselves designated reveals that they asked the Court to grant them summary judgment on the basis of facts that are in dispute.

At worst, it shows that they misrepresented the record and attempted to mislead the Court by selectively quoting favorable evidence and ignoring unfavorable evidence. *Id.*

It should go without saying that the Court expects attorneys who practice in this Court to abide by the ethical standards and procedural rules governing federal litigation. By necessity, the defendants filed a motion they knew was doomed unless the Court ignored the evidentiary record or disregard the summary judgment standard. A litigation strategy asking the Court to commit error is "'costly and wasteful'" and cannot be tolerated. *Littler v. Martinez*, No. 2:16-cv-00472-JMS-DLP, 2020 WL 42776, at *61 (S.D. Ind. Jan. 3, 2020) (quoting *Malin*, 762 F.3d at 564).

### V. Conclusion and Further Proceedings

The defendants' motion for summary judgment, dkt. [40], is **denied**.

The Court intends to recruit an attorney to represent Mr. McCullough for the remainder of the action pursuant to 28 U.S.C. § 1915(e). If Mr. McCullough objects to the appointment of counsel, he must file an objection in writing immediately.

The defendants will have **30 days** following counsel's appointment to **show cause** why the Court should not enter summary judgment in Mr. McCullough's favor on the question of liability pursuant to Rule 56(f)(1). Mr. McCullough will have **15 days** to file any response. Absent a settlement, a trial will take place to resolve any claims on which Mr. McCullough does not receive summary judgment and to determine damages.

Defense counsel will also have **30 days** following counsel's appointment to **show cause** why they should not be sanctioned pursuant to Rule 11(c). Mr. McCullough will have **15 days** to file any response.

The **clerk is directed** to change Mr. McCullough's first name on the docket from "Antone" to "Antione."

**IT IS SO ORDERED.**

Date: _3/27/2025_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

ANTONE MCCULLOUGH
127898
PENDLETON – CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Stephanie Michelle Davis
Office of Attorney General Todd Rokita
stephanie.davis@atg.in.gov

Gustavo Angel Jimenez
INDIANA ATTORNEY GENERAL
gustavo.jimenez@atg.in.gov